**LAW OFFICE OF CAROL A. SOBEL**
**CAROL A. SOBEL** SBN 84483
**MONIQUE A. ALARCON** SBN 311650
**WESTON ROWLAND** SBN 327599
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
t. 310.393.3055
e. carolsobel@aol.com
e. monique.alarcon8@gmail.com
e. rowlandweston@gmail.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REX SCHELLENBERG, an individual<br><br>Plaintiff,<br><br>v.<br>THE CITY OF LOS ANGELES, a municipal entity; LAPD SENIOR LEAD OFFICER SEAN DINSE, sued in his individual capacity, and Does 1-10.<br><br>Defendant. | Case No.:<br><br>**CIVIL RIGHTS COMPLAINT**<br><br>42 U.S.C. § 1983: Fourth and Fourteenth Amendments;<br>Cal. Const. Article 1, §§ 7, 13;<br>Cal. Civ. Code § 52.1. |

**JURISDICTION AND VENUE**

1. This is an action for injunctive relief, declaratory relief, and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution and California constitutional and statutory law. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal constitutional law and 42 U.S.C. § 1983. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as Plaintiff's federal claims.

2. Venue is proper in the Central District of California pursuant to 28 U.S.C. §1391(b) as all parties reside in the Central District and the events and conduct complained of herein all occurred in the Central District.

**PRELIMINARY STATEMENT**

3. In January 2019, the County of Los Angeles conducted its annual Point-in-Time Count of sheltered and unsheltered people experiencing homelessness. The 2019 Point-in-Time Count revealed that in the City of Los Angeles alone, approximately 36,000 individuals are without permanent shelter on any given night. Approximately 16,000 unhoused individuals live in their vehicles across Los Angeles County. Countless studies have shown that the affordable housing crises in Los Angeles is driving the increase in homelessness.

4. As the visibility of unhoused persons increases throughout the City, non-homeless residents have increasingly taken to online social networking platforms such as NextDoor and Facebook to air grievances regarding unhoused people in their neighborhoods. Los Angeles Police Department ("LAPD") officers joined these online social networking platforms in their role as LAPD officers.

5. Some private Facebook groups gained notoriety for the anti-homeless rhetoric revealed such as "Crimebusters of West Hills and Woodland Hills" and

1  "Homeless Transient Encampments of our West Valley."  Acting in their official
2  roles, LAPD Senior Lead Officers participate in these private Facebook groups,
3  even as group administrators.  The significant role of ranking LAPD officers in
4  these Facebook groups was the subject of a complaint lodged with the California
5  Attorney General's ("AG") office in 2018.

6.  In response to the complaint filed with the AG, the LAPD conducted a formal review of these Facebook groups and learned that many involved private parties posting demeaning comments about individuals experiencing homelessness. The complaint to the AG included such comments by LAPD Senior Lead Officers, who disclosed private information, learned through their position as police officers, about unhoused individuals in their posts.  In many of these, LAPD Senior Lead Officers directed local residents to lodge formal complaints with the City so that the LAPD then could take action against unhoused individuals.

7.  On information and belief, Plaintiff alleges that, in response to the AG complaint and its own internal investigation, the LAPD did nothing more than remind officers of the department's social media policy. Nothing changed.  The LAPD allowed its Senior Lead Officers and other personnel to continue participating in and serving as administrators for these groups.  The unlawful practices by the LAPD continued unabated in many jurisdictions, including the West Valley.  This response to an identified problem by the LAPD was inadequate and left unhoused individuals, such as Plaintiff, subject to sanctioned harassment by private parties and pretextual enforcement efforts by the LAPD, led by Senior Lead Officers, as here, that resulted in repeated violations of Plaintiff's rights.

## PARTIES

**PLAINTIFF:**

**Rex Schellenberg**

8.  Plaintiff **REX SCHELLENBERG** is an octogenarian, chronically homeless and severely physically disabled individual residing in the City of Los

Angeles. As he is retired and disabled, he lives on a limited fixed income and is unable to secure appropriate affordable housing in the City that is within his financial means and accommodates his disability.

9. While living on the streets, Mr. **SCHELLENBERG** worked with Los Angeles Homeless Services Authority (LAHSA) to secure permanent supportive housing, but those efforts proved unsuccessful. In fact, in one instance of unlawful seizure of his property, his housing voucher was destroyed by City personnel. Mr. Schellenberg was informed and understood that the only way the voucher could be replaced was for him to go to the LAHSA office on Skid Row, some 40 miles from the West Valley. Without transportation and a place to leave his property without it being seized and destroyed again, Plaintiff was unable to replace his voucher.

10. Since 2017, City employees have unlawfully seized Plaintiff's essential property numerous times. These property seizures are the subject of a pending suit in the United States District Court for the Central District of California, Case. No. 2:18-CV-07670-CAS-PLA. Mr. **SCHELLENBERG** contends that during each of the property seizures alleged in that action, Los Angeles Police Department officers were present while Department of Sanitation employees sorted through his essential property and discarded some or all of it without a warrant and without proper pre- and post- deprivation notice. The officers prevented Plaintiff from rescuing his property.

11. In an effort to protect his property and shield himself from increased law enforcement interactions, Plaintiff used his meager income to purchase a used van at a public lien sale auction on or about March 2019. At all times relevant to the matters sought to be redressed in this action, Plaintiff resided in his vehicle. In April 2019 and again in June 2019, the van was unlawfully seized by Defendants.

**DEFENDANTS:**

12. Defendant **CITY OF LOS ANGELES** ("**CITY**") is a municipal entity organized under the laws of the State of California with the capacity to sue

1  and be sued.  The Los Angeles Police Department ("LAPD"), is a department of
2  the City.  The **CITY** is sued on the basis of the policies, customs, and practices of
3  the **CITY**, including those of the LAPD, which gave rise to Plaintiff's federal civil
4  rights claims, and on the basis of respondent superior for the state law claims.

5         13.      **Senior Lead Officer (SLO) SEAN DINSE** was at all times relevant
6  to this action an employee and agent of the LAPD and is responsible for the acts
7  and omissions complained of herein.  SLO SEAN **DINSE**, *inter alia*, conspired
8  with certain community residents to target and harass Plaintiff and directed
9  unlawful seizures of Plaintiff Schellenberg's vehicle.  **DINSE** also engaged in a
10 pattern of harassment against Mr. Schellenberg both in person and online.
11 Specifically, SLO SEAN **DINSE** repeatedly interfered with Mr. Schellenberg's
12 right to be present in public places.  SLO SEAN **DINSE** disseminated private
13 information concerning Mr. Schellenberg on Facebook.  At times, he informed
14 members of the Facebook group where Mr. Schellenberg was staying.  SLO
15 DINSE disclosed this information to the private Facebook group so that they could
16 then contact the police and complain about Mr. Schellenberg's presence at a
17 particular location and, in turn, provide a pretextual basis for the LAPD to compel
18 Mr. Schellenberg to move or seize his property.  SLO **DINSE** posted information
19 on Facebook for private individuals to surveil Mr. Schellenberg and/or used
20 information posted on Facebook groups to surveil Mr. Schellenberg, all without a
21 lawful purpose.  He is sued in his individual and official capacities.

22        14.      The Defendant CITY, its employees and agents, personally
23 participated in the unlawful conduct challenged herein and, to the extent that it did
24 not personally participate, the CITY authorized, acquiesced, set in motion, or
25 otherwise failed to take necessary steps to prevent the acts that resulted in the
26 unlawful conduct and the harm suffered by Plaintiff.

27        15.      The identities and capacities of Defendants **DOES 1 through 10** are
28 presently unknown to Plaintiff, and on this basis, Plaintiff sues these Defendants

by fictitious names. Plaintiff will amend the Complaint to substitute the true names and capacities of the DOE Defendants when ascertained. Plaintiff is informed, believes, and thereon alleges that DOES 1 through 10 are, and at all times relevant to this complaint, were employees or agents of the Defendant **CITY** and are responsible for the acts and omissions complained of herein. Defendants DOES 1 through 10 are sued in their official and individual capacities.

## FACTS

16. Mr. Schellenberg's chronic homelessness has exposed him to various interactions with LAPD officers while living on the streets of the City of Los Angeles. When Mr. Schellenberg is stopped and questioned by law enforcement officers, a frequent occurrence, he feels as though he is not free to leave. Through these interactions, LAPD officers, including Defendant SLO SEAN **DINSE**, have learned and gathered personal information about Mr. Schellenberg.

17. Defendant SLO **DINSE** personally interacted with Mr. Schellenberg since 2016. On the private Facebook site that he administers, Defendant SLO **DINSE** refers to Plaintiff as one of his "regulars."

18. On information and belief, as Senior Lead Officer, SLO **DINSE** received approval from the LAPD's Public Information Director (PID) to utilize an official department social media account on Facebook. His official department Facebook account is under the name "SLO Sean Dinse."

19. Using his official department social media account, SLO SEAN **DINSE** joined private Facebook groups, including the groups "Crimebusters of West Hills and Woodland Hills" and "Homeless Transient Encampments of our West Valley." On information and belief, the groups were created by a private citizen, Fern Peskin-White, who served as a group administrator for each group during all relevant times in the events complained of in this action. Defendant SLO **DINSE** also serves as a group administrator.

20. Since 2016, Defendant SLO **DINSE** has shared personal information about Mr. Schellenberg on his official department social media account, and on the private Facebook groups in which he serves as an administrator.

21. For example, on August 26, 2016, Defendant **DINSE**, through a post on his official department account, told what purported to be Plaintiff's life story and how he became homeless. He disclosed where Plaintiff's tent was set up at the time, that he was waiting for the Department of Mental Health to assist him with a housing application and wrote of Plaintiff's physical disabilities that contributed to his homelessness. In his initial posts, **DINSE** included Plaintiff's last name. Exhibit 1a, below, is a true and correct copy of the Facebook posts.

22. On information and belief, at some point in 2017, **DINSE** wrote in the private Facebook group Crimebusters of West Hills and Woodland Hills: "[t]here are two encampments at the location and Rex S. is staying inside the orange tent within other encampment [sic]." He also wrote "I worked with Rex. S for the past year and a half to get him into housing he was evicted probably due to his drug addiction/mental illness." Exhibit 1b, below, is a true correct copy of the post.

Exhibit 1a                                      Exhibit 1b



23. In fact, Mr. Schellenberg does not suffer from mental illness other than the ordinary stress and trauma of living on the streets, nor is he a drug addict.

24. On or about August 1, 2018, Plaintiff Schellenberg was at Warner Center Park in the neighborhood of Woodland Hills. During hot summer days, Mr. Schellenberg sought shade and rest in the park during park hours while he left most of his property packed up on the public sidewalk outside of the park. He left his property outside the park so that he would not be accused of "camping" in the park because he had a sleeping bag, tent, and blankets next to him.

25. While Plaintiff was resting in the shade, Defendant **DINSE** arrived at the park and informed Mr. Schellenberg that he could not camp there and needed to leave. Plaintiff responded that he was not "camping" in the park. Nonetheless, **DINSE** forced him to move.

26. On or about August 13, 2018, Plaintiff was again resting in Warner Center Park to get out of the sun when **DINSE** arrived and again told Plaintiff that he could not camp in the park. Plaintiff again said that he was not "camping" in the park and had only a few belongings with him. The rest of Plaintiff's essential items were neatly stored on the public sidewalk, where he routinely left them. Exhibit 2 is a true and correct depiction of Mr. Schellenberg's property on this day.



27. Although forced to move, Mr. Schellenberg was never cited for camping in a public park.

28. In an effort to protect his property and shield himself from contacts with SLO **DINSE** and increased law enforcement interactions, Mr. Schellenberg sought to purchase a vehicle.

29. On or about March 2019, Mr. Schellenberg purchased a van at a lien sale auction held by Howard Sommers Towing, Inc. ("Howard Sommers Towing"). Howard Sommers Towing is the Los Angeles Police Department's Official Parking Garage. It tows and impounds vehicles at the direction of LAPD officers from LAPD's West Valley and Topanga Divisions.

30. Mr. Schellenberg paid approximately $360 for the vehicle. He parked the van on City streets and began sleeping in it. Shortly after, when Defendant **DINSE** learned that Plaintiff was residing in the van, **DINSE** targeted the vehicle.

31. On April 25, 2019, Plaintiff's vehicle was lawfully parked. Defendant SLO **DINSE** arrived at the location and had the vehicle impounded and towed on a purported violation of Los Angeles Municipal Code §80.73.2: "abandoning" a vehicle on a city street for more than 72 hours. SLO **DINSE** knew full well that the van belonged to Plaintiff and knew that the vehicle was not abandoned, was not interfering with traffic, and did not pose a safety threat requiring removal of the vehicle under the Community Care doctrine.

32. On both occasions when Defendants towed Plaintiff's van, they violated state law and the Fourth Amendment. California Vehicle Code §22650 expressly prohibits law enforcement officers or other authorized personnel from towing a vehicle from a public place unless one of several explicit conditions is met. Specifically,

> It is unlawful for a peace officer or an unauthorized person to remove an unattended vehicle from a highway to a garage or to any other place, except as provided in this code.

33. California Vehicle Code § 22650(b) provides, in no uncertain terms:

> Any removal of a vehicle is a seizure under the Fourth Amendment of the Constitution of the United States and Section 13 of Article I of the California Constitution, and shall be reasonable and subject to the limits set forth in Fourth Amendment jurisprudence. A removal pursuant to an authority, including, but not limited to, as provided in Section 22651, that is based on community caretaking, is only reasonable if the removal is necessary to achieve the community caretaking need, such as ensuring the safe flow of traffic or protecting property from theft or vandalism.

34. Plaintiff alleges, on information and belief, that the usual practice of the LAPD where they believe a vehicle has been parked in the same place for more than 72 hours and poses no threat to traffic or the community is to issue a citation. This comports with the provisions of California Vehicle Code §22651(o)(1)(A), which restricts and codifies the bases for towing a vehicle from a public place.

35. On information and belief, Plaintiff alleges that the policy applied to vehicles believed to belong to unhoused persons who sleep in their vehicles is vastly different. In these circumstances, the vehicle is routinely towed, causing indigent persons to incur impossibly high fines and penalties that result in the loss of the only shelter available to them as one of 36,000 unhoused persons and financially crippling towing and impound fees, often then sent to collections, and becoming a barrier to obtaining jobs, housing and benefits.

36. None of the grounds for towing – rather than simply issuing a citation to a vehicle believed to be unlawfully parked or not compliant with registration requirements – support seizing Plaintiff's vehicle. In clear violation of the state Vehicle Code, instead of citing Mr. Schellenberg for the alleged violation, which would have set in play a due process system to challenge the citation, Defendant SLO **DINSE** directed Plaintiff's vehicle be towed immediately. On information and belief, Plaintiff alleges that Defendant **DINSE** took this course of conduct, in violation of state law, as part of his intentional harassment of Plaintiff.

37. Mr. Schellenberg's vehicle was towed to Howard Sommers's impound lot in Canoga Park. After owning his vehicle for only one month, Plaintiff had no alternative but to return to the streets and sleep without shelter.

38. When Mr. Schellenberg went to Howard Sommers's impound lot to retrieve his vehicle, he was told that he had to pay the $133 towing fee, a $115 City release fee, and $45 per day as a storage fee. Plaintiff would have had to pay over $500 to retrieve his vehicle, more than he paid for it originally. Mr. Schellenberg could not afford to pay this amount. He learned that, in approximately 31 days from the Notice of Pending Sale that was sent to him as the registered owner of the vehicle, his van would be sold at another lien sale action. By June 2019, Mr. Schellenberg had accrued $1,904 in impound fees for the seizure of his van and was again sleeping on the streets.

39. On June 4, 2019, Mr. Schellenberg repurchased his vehicle for $360, less than the impound and towing fees, and, again legally parked on City streets.

40. Soon after repurchasing his van, Mr. Schellenberg experienced more harassment by LAPD officers, and on information and belief, it was prompted by information posted on the private Facebook groups.

41. On June 22, 2019, he was lawfully parked at metered street parking on Topanga Canyon Boulevard in Woodland Hills. Plaintiff has a valid disability placard and, pursuant to California Vehicle Code 22511.5, is exempt from certain posted time restrictions and parking meter fees. To ensure that SLO **DINSE** would have no pretense to impound his vehicle again, Plaintiff moved it every three days.

42. On June 22, 2019, members of the Facebook group "Crimebusters of West Hills and Woodland Hills" posted an image of Mr. Schellenberg getting into his vehicle and wrote "Who can I call about this? He's been parked here for 2 weeks on street parking.... I think his rent is the meter? On Topanga before the Chevron station at Avenue San Luis." The group administrator, Fern Peskin-White responded by identifying Plaintiff by name, referring to him as a local transient.

1  She incorrectly stated that he was parked in a "red zone" and people should call
2  LAPD's non-emergency line to report him.  She cautioned that posts of that nature
3  should be in the group's private sub-group.  On information and belief, the group
4  Ms. Peskin-White was referring to is, "Homeless Transients of our West Valley."
5  Exhibit 3 is a true and correct copy of the Facebook group post, depicting Plaintiff
6  at his van and showing that the curb adjacent to Plaintiff's van was not red.



43.   On or about July 22, 2019, Plaintiff Schellenberg was lawfully parked in City of Los Angeles Department of Transportation (LADOT) Facility No. 705, a parking lot at Ventura Boulevard and Don Pio Dr. in Woodland Hills.  The lot provides metered parking for a daily rate of $2.50 with a 12-hour maximum time limit.  With his disability placard, Mr. Schellenberg was exempt from time

1 restrictions and he was not required to pay any parking meter fees.  In accordance
2 with LAMC 80.73.2, Mr. Schellenberg would move his vehicle within 72-hours.

3   44. That same day, Defendant **DINSE** arrived at LADOT Facility No. 705.  He stopped Mr. Schellenberg and accused him of leaving trash along the back fence of the parking lot.  Mr. Schellenberg explained that the trash was not his.  Defendant SLO SEAN **DINSE** left without incident and without comment that Plaintiff was otherwise unlawfully parked at this LADOT lot.

  45. The next day, an unknown LAPD officer arrived at LADOT Facility No. 705.  The officer incorrectly informed Plaintiff that he was not allowed to park in that lot without paying.  Mr. Schellenberg explained that because he had a disability placard, he was not required to pay the meter fee.  The LAPD officer insisted, wrongly, that Plaintiff was required to pay the meter.

  46. Eventually, a LAPD Sergeant arrived on the scene and agreed that Mr. Schellenberg was not required to pay the meter fee but proceeded to conduct an unauthorized vehicle inspection of the van.  The van was fully operable.  The vehicle did not have registration tags displayed on the license plate; however, when questioned by the officers, Plaintiff explained to the LAPD officers that he had only recently re-purchased the van from a public auction.  Plaintiff showed the officers proof of payment on July 12, 2019 of $515 for the registration fee and daily moving permits issued by the DMV, pending a smog inspection certification.

  47. While Plaintiff was detained by the officers conducting the unjustified vehicle inspection, Defendant **DINSE** arrived, along with a tow truck from Howards Sommers Towing.  The tow truck parked in front of Defendant **DINSE**'s patrol car.  In sufficient proximity for Plaintiff to hear the exchange, Defendant **DINSE** told the LAPD Sergeant that he knows Mr. Schellenberg and that he is "trouble."  He asserted that because Plaintiff now owned a vehicle, he would be more trouble.  Again, in voices sufficiently loud and in close proximity to Plaintiff, SLO **DINSE** convinced the Sergeant to tow Plaintiff's van.

48. Defendant **DINSE** and the other LAPD officers involved in causing Plaintiff's vehicle to be towed while lawfully parked on the LADOT lot knew or should have known that Plaintiff's registration was paid and that the only reason he had not received the current registration tags was because he needed to complete the smog certification. Defendant LAPD officers knew or should have known that the daily moving permits issued by the DMV were sufficient for temporary registration requirements.

49. Mr. Schellenberg was only able to retrieve a few items and blankets from his vehicle before it was towed. That night, he slept on the street.

50. Plaintiff's counsel contacted the City immediately to complain that Plaintiff's van had been towed unlawfully. Early the next morning, Mr. Schellenberg received a call from LAPD Auto Investigator Watt, who told Plaintiff to get to the Howard Sommers tow yard in Canoga Park as soon as possible to pick up his vehicle. When Plaintiff questioned Investigator Watt about the tow, the investigator only told him that LAPD had reviewed the incident and decided to release the vehicle and absorb the cost of the tow.

## MONELL ALLEGATIONS

51. Based upon in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Defendant **CITY** is liable for all Plaintiffs' injuries as they were directly caused by the **CITY**'s the policies, practices and customs.

52. On information and belief, the **CITY** has a policy and practice of allowing LAPD employees, including Senior Lead Officers, to run official department social media accounts, subject to LAPD's Public Information Director (PID) approval and monitoring.

53. On information and belief, the **CITY** has a policy and practice of allowing LAPD employees, including Senior Lead Officers, to utilize their official social media accounts to promote communication and outreach with community members on issues relevant to the official business of the Department.

54. On information and belief, the **CITY** has a policy and practice of allowing LAPD employees, including Senior Lead Officers, to utilize official social media accounts to post communications that violate department policy, including by disseminating private information that LAPD officers receive while interacting with unhoused individuals in the **CITY**, in their official role as LAPD officers, and by using information posted on Facebook groups to surveil and harass unhoused individuals in the **CITY**. The **CITY** was put on notice about this unlawful conduct and even after an investigation, the **CITY** authorized, acquiesced, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiff.

55. On information and belief, the **CITY** failed to develop adequate policies, training and supervision with respect to constitutional rights involving the First Amendment right to "loiter" in public, the constitutional limits on seizure of personal property and the right to due process of law, and Vehicle Code prohibitions on towing vehicles unless at least one of an explicit list of criteria is met.

56. Moreover, the Defendant **CITY** was on notice of the unlawfulness of their actions based on previous legal actions brought against the City for nearly identical operations.

**FIRST CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**Fourth and Fourteenth Amendments (42 U.S.C. § 1983)**
**California Constitution, Art. 1, § 13; California Vehicle Code § 22650(b)**
**(Against All Defendants);**

57. Plaintiff realleges and incorporates the allegations set forth in the proceeding paragraphs as though fully set forth herein.

58. Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure of his property by seizing and impounding Plaintiff's vehicle and the contents of the vehicle without a warrant on multiple occasions.

59. These unlawful actions were done with the specific intent to deprive Plaintiff of his constitutional right to be secure in his property.

60. Plaintiff is informed and believes that the acts of Defendant **CITY**, its employees and agents, and of Defendant SLO **DINSE** were intentional in unlawfully seizing Plaintiff's property and that, at a minimum, were deliberately indifferent to the likely consequence that the property would be unlawfully seized, even though the right at issue was well-established at the time.

61. As a direct and proximate consequence of these unlawful acts, Plaintiff has suffered and continues to suffer loss of his personal property and is entitled to compensatory damages for violations of his federal constitutional rights and injury to his property and person.

**SECOND CAUSE OF ACTION**
**Right to Due Process of Law**
**Fourteenth Amendment (42 U.S.C. § 1983)**
**California Constitution, Art. 1, § 7**
**(Against All Defendants)**

62. Plaintiff realleges and incorporates the allegations set forth in the proceeding paragraphs as though fully set forth herein.

63. Defendants, and its employees and agents owed a duty to Plaintiff under the due process clause of the Fourteenth Amendment to provide Plaintiff with adequate notice that his vehicle was at risk of being seized and impounded.

64. These unlawful actions were done with the specific intent to deprive Plaintiff of his constitutional right to due process of law.

65. Plaintiff is informed and believes that the acts of Defendant **CITY**, its employees and agents, including Defendant **DINSE**, were intentional in failing to protect and preserve Plaintiff's property that was in his van and that, at a

minimum, were deliberately indifferent to the likely consequence that the van would be unlawfully seized and the property in it as well, even though the right at issue was well-established at the time.

66. As a direct and proximate consequence of these unlawful acts, Plaintiff has suffered and continues to suffer loss of his personal property and is entitled to compensatory damages for his property and personal injury.

### THIRD CAUSE OF ACTION
### Bane Act
### Cal. Civ. Code § 52.1
### (Against All Defendants)

67. Plaintiff realleges and incorporates the allegations set forth in the proceeding paragraphs as though fully set forth herein.

68. Plaintiff's rights were violated under both the United States Constitution, the California Constitution, and the California Vehicle Code.

69. Defendants engaged in threats, intimidation and coercion, and attempted threats, intimidation and coercion, all to interfere with Plaintiff's constitutional and statutory rights.

70. Plaintiff is entitled to injunctive and declaratory relief to remedy the repeated interference and attempted interference with his rights as set forth above.

### PRAYER FOR RELIEF

71. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth herein.

**WHEREFORE**, Plaintiff prays as follows:

1. For a declaratory judgment that the Defendant **CITY**'s policies, practices and conduct as alleged herein violated Plaintiff's rights under the United States and California Constitutions and the laws of California;

2. For a declaratory judgment that the Defendant SLO SEAN **DINSE**'s conduct as alleged herein violated Plaintiff's rights under the United States and California Constitutions and the laws of California;

3. For an order enjoining and restraining the Defendant **CITY** from engaging in the policies, practices, and conduct complained of herein;

4. For an order enjoining and restraining Defendant SLO SEAN **DINSE** from engaging in the policies, practices, and conduct complained of herein;

5. For general and compensatory damages according to proof for the loss of Plaintiff's property, the violation of his constitutional rights, and for pain and suffering resulting from the constitutional violations caused by Defendants;

6. For an award of punitive and exemplary damages against Defendant SLO SEAN **DINSE**, and

7. For costs of suit and attorney fees as provided by law;

8. For such other relief as the Court deems just and proper.

Dated: February 10, 2020          Respectfully submitted,

                                  LAW OFFICE OF CAROL A. SOBEL


                                  /s/  Monique A. Alarcon
                                  By:  MONIQUE A. ALARCON
                                  Attorneys for Plaintiffs